# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID A. AUER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10-CV-5285 |
| ) | |
| ALLIED AIR CONDITIONING AND ) | |
| HEATING CORPORATION ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment brought by Defendant Allied Air Conditioning and Heating Corporation ("Allied"). Plaintiff, David A. Auer, alleges that Allied terminated his employment because of his disability, depression, in violation of the Americans with Disabilities Act ("ADA"). Allied, in turn, asserts that Plaintiff has no evidence to support his discrimination claim. Allied has also filed a motion to strike Plaintiff's first and second affidavit, as well as objections to Plaintiff's statement of facts. We deal first with the evidentiary issues. Then, after discussing the factual background, we turn to the motion for summary judgment. We grant the motion for summary judgment because Plaintiff cannot demonstrate that the person who terminated his employment was aware of his disability.

## II. Motions to Strike

Plaintiff's first affidavit focuses on whether another Allied employee, James Potter, replaced Plaintiff by taking over his job responsibilities. (Pl. Ex. 12 (First Aff).) In the affidavit, Plaintiff speculates that Potter took over his job duties because (1) Potter was in a service van,

thus he was working as a Service Technician, and (2) Potter was listed on the call calendar for January 2010, therefore he had been switched from an Installer to a Service Technician. (*Id.* ¶¶ 9–10, 14).  These statements are not based on personal knowledge, but are instead presumed from other facts known to Plaintiff.  Pursuant to Allied's motion, we will strike these statements from the record.  *See* Fed. R. Civ. P. 56(e).

Plaintiff's second affidavit focuses on what was said between Plaintiff and Kevin Budinger at the time Budinger terminated Plaintiff's employment.  The affidavit was submitted five months after Plaintiff's deposition.  In both the deposition and the second affidavit, Plaintiff asserts that he asked Mr. Budinger, "Does this have anything to do with my discussion with Mr. Bauer?"  According to Plaintiff's deposition, "[Budinger] didn't say anything.  He just looked away."  (Def. Ex. C (Dep. of Auer) at 60–61.)  In his second affidavit, Plaintiff alleges that Budinger answered, "It has nothing to do with that."  (Pl. Ex. 13 (Second Aff. ¶¶ 4–5.)  "Where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken."  *Russell v. Acme-Evans Co., ADM*, 51 F.3d 64, 67–68 (7th Cir. 1995).  Plaintiff concedes that the affidavit and deposition differ, but asserts that both versions demonstrate that Budinger failed to deny knowledge of the discussion.  While this may be true, Plaintiff may not put words in a defendant's mouth, particularly when Plaintiff wishes to use the alleged statement to prove that Budinger had knowledge of Plaintiff's disability.  (*See* Resp. at 14.)  *See also Russell*, 51 F.3d at 67 (noting that the Seventh Circuit is "highly critical of efforts to patch up a party's deposition with his own subsequent affidavit"); *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1995) (not allowing plaintiff to assert a highly specific description of an item after previously disclaiming knowledge of the item, when

doing so would establish the missing causal link between the defendant and her injury). The remainder of Plaintiff's second affidavit draws assumptions based on the contradictory testimony (Pl. Ex. 13 (Second Aff.) ¶¶ 7–9) or consists of analyses and legal conclusions, typically based on Allied's employee's depositions. (*Id.* ¶¶ 10–12.) Therefore, we grant Allied's motion to strike Plaintiff's second affidavit.

Allied brings a second motion to strike Plaintiff's additional facts and responses to Allied's statement of facts. First, we deny the motion to strike Plaintiff's additional facts. We do not find that Plaintiff substantially abused the local rules by including more than one fact in some paragraphs. Second, we grant in part the motion to strike Plaintiff's responses to Allied's statement of facts. We agree that Plaintiff's responses frequently are argumentative and present new facts. Some of the responses are non-responsive. (*See e.g.*, ¶¶ 3–5.) We strike other responses for failure to cite to the record. L.R. 56.1(a). (*See e.g.*, ¶¶ 56, 64, 65, 68.) Additionally, we strike the responses to paragraphs 45, 47, 48, 52–55 to the extent that they rely on Plaintiff's second affidavit.

The facts relied upon in the remainder of this opinion are those that have been admitted or not properly denied. We indicate disputes over material facts below. Further, to the extent that statements made by Plaintiff are included in this opinion, they are consistent with our ruling on the motions to strike.

### III. Background

Allied is an air conditioning and heating installation and service company with facilities in Palatine and Libertyville, Illinois. (Def. 56.1 Stat. ¶ 1.) Brent Bauer is the Vice President and co-owner of Allied. (*Id.* at ¶ 2.) Kevin Budinger is the shop manager for Allied's Palatine office

and is responsible for advertising, marketing, sales, sales management, operations management, overseeing office operation, as well as hiring, promotion, discipline, and termination. (*Id.* ¶¶ 3, 4.)

Allied employs two types of technicians: Service Technicians and Installation Technicians. (Def. 56.1 Stat. ¶ 5.) The parties agree that there is a difference between a Lead/Senior Service Technician and all other Service Technicians. (Pl. Resp. to Def. 56.1 Stat. ¶ 6.) However the parties dispute whether the non-Lead Service Technicians are further divided into Level 1/Trainee Service Technicians, and Level 2 Service Technicians. (Def. Ex. B (Dep. of Bauer) at 62–63.) Plaintiff asserts that the distinction between a Level 1/Trainee Technician and a Level 2 Technician was fabricated for this litigation. (Pl. Resp. to Def. 56.1 Stat. ¶¶ 6–7.) The single mention of the distinction is in Allied's Personnel Manual, which describes the three different designation when listing the tools each technician is expected to possess. (Def. Ex. B (Dep. of Bauer) at 68–69.) The document is dated "02/28/2010," —Allied claims that this is the date on which the document was printed, not created—but Allied is not sure when the levels were created. (Pl. 56.1 Stat. ¶ 21; Def. Resp. to Pl. 56.1 Stat. ¶¶ 1, 20.) Assuming the titles do exist, the parties agree that Budinger has discretion to give the employees the job designation "Level 1" or "Level 2"—the designation is allegedly based on his evaluation of the applicant's education and work experience. (Pl. 56.1 Stat. ¶ 17; Def. Resp. to Pl. 56.1 Stat. ¶ 17.) The parties agree that a Level 2 Service Technician cannot be replaced by an Installer, an Install Trainee, or Parts Runner. (Def. 56.1 Stat. ¶¶ 59–60.) Plaintiff contests Allied's assertion that a Level 2 Service Technician cannot be replaced by a Level 1/Service Trainee. (Def. 56.1 Stat. ¶ 58; Pl. Resp. to Def. 56.1 Stat. ¶ 58.)

Plaintiff was hired on February 15, 2008 by Budinger. (Def. 56.1 Stat. ¶ 13.) Allied asserts that Plaintiff was hired as and continued to be a Level 2 Service Technician. (*Id*. ¶ 57.) The designation "Level 2" is not in Plaintiff's Personnel File, Application, Service Technician Position Contract, or Service Technician Payroll Procedures, and Plaintiff disputes he was ever labeled a Level 2. (Def. Ex. B (Dep. of Bauer) at 60; Pl. 56.1 Stat. ¶¶ 18, 21.) At the time of Plaintiff's employment, Plaintiff indicated he would like to be included on the night shift calendar to make extra money.[1] (Def. 56.1 Stat. ¶¶ 25–26.) Plaintiff's job consisted mostly of performing preventative maintenance on residential furnaces.[2] (Def. Ex. C (Dep. of Auer) at 34.) Plaintiff originally earned $20.00 per hour. He received a $1.00 per hour raise in both June and August, bringing his hourly rate to the level he had originally requested at the time of his hire. (Def. 56.1 Stat. ¶ 14–16.) These increases were based on Plaintiff's good work performance, which were noted in voice mails praising his work. (Pl. 56.1 Stat. ¶ 35.)

In early March, Bauer told Budinger he wanted to meet with Plaintiff to discuss a customer complaint. (Pl. 56.1 Stat. ¶ 24.) On March 6, Budinger told Plaintiff to go to Bauer's office, and Plaintiff and Bauer met to discuss the complaint. (Pl. 56.1 Stat. ¶ 29; Def. 56.1 Stat. ¶ 17.) After discussing the complaint, Plaintiff disclosed to Bauer that he was seeing a doctor; he also explained that he was taking prescription medication that made him drowsy and made it

---

[1] Customer service calls are answered 24 hours a day, seven days a week. (Def. 56.1 Stat. ¶ 12.) Plaintiff was aware that if he removed his name from the night shift calendar, another employee would have to fill in. (*Id*. ¶ 27.)

[2] This involves working with and around pipes encapsulating natural gas. (Def. 56.1 Stat. ¶ 23.) This is one reason the Allied employee handbook requires all employees to notify Allied if they are taking medication that makes them drowsy or if they experience difficulties concentrating at work. (Def. 56.1 Stat. ¶ 21.)

difficult for him to think. (*Id.* ¶¶ 18–19.) Plaintiff asserts, and Allied disputes, that Bauer demanded more disclosure, that Plaintiff responded with the names of the medication and that he was being treated for depression, and that Bauer responded by saying "whoa . . . those are powerful drugs." (Def. Ex. C (Dep. of Auer) at 129.)

The parties agree that Plaintiff requested removal from the night call schedule because his medication made him drowsy. (Def. 56.1 Stat. ¶ 28.) There is a dispute as to whether Bauer told Plaintiff the request was unreasonable because night call is the nature of the business, but Bauer did refer to night call as the nature of the business during his deposition. (Pl. 56.1 Stat. ¶ 4; Def. Reply to Pl. 56.1 Stat. ¶ 4.) According to Allied, Bauer referred Plaintiff's request to Allied's night call scheduler, Heather Imboden, and asked Imboden to remove Plaintiff from night call for the rest of the month. (Def. 56.1 Stat. ¶¶ 29, 30.) Plaintiff was not aware that Bauer attempted to remove him from night call, instead he states that the meeting ended abruptly after he asked to be taken off night call. (Def. Ex. C (Dep. of Auer) at 129–30.) Plaintiff also believes that he was never removed from night call and was in fact on call on the date of his termination. (Def. Ex. C (Dep. of Auer) at 58.) Plaintiff never asked Budinger, or any other Allied employee, that he be removed from night call, and Budinger was never aware that Plaintiff was removed from the night call calendar. (Def. 56.1 Stat. ¶¶ 33, 35.)

Allied maintains a line of credit with Harris Bank to provide necessary funds during periods of financial losses or downturns. (Def. 56.1 Stat. ¶ 37.) The maximum balance Allied can carry on its line of credit is $250,000, and Allied pays off the line of credit during profitable seasons. (*Id.* ¶ 38; Def. Ex. B (Dep. of Bauer) at 76.) The spring season is a normal financial down period for Allied. (Def. Ex. B (Dep. of Bauer) at 76.) In March and April 2009, Allied

had taken out $100,000 on the line of credit. (Def. 56.1 Stat. ¶ 36.) The business was also on a short work week in March of 28–32 hours per week. (*Id.* ¶ 41.) These conditions were not uncommon, as Allied's losses were twice as much during the same period in 2008—when Plaintiff was hired. (Pl. 56.1 Stat. ¶ 15.) Allied asserts, and Plaintiff denies, that due to these conditions, Allied's owners instructed Budinger to reduce overhead expenses at that time. (Def. 56.1 Stat. ¶ 42; Pl. Resp. to Def. 56.1 Stat. ¶ 42.)

Budinger terminated Plaintiff on March 21, 2009, allegedly as part of a reduction in force initiated to reduce overhead expenses.[3] (Def. 56.1 Stat. ¶ 43.) Budinger informed Plaintiff that the company had to cut expenses, and though he wished he didn't have to, he had to let Plaintiff go; no one else was involved in the conversation.[4] (*Id.* ¶ 48.) Allied asserts that Budinger acted alone in laying off Plaintiff, and while denying this assertion, Plaintiff has not presented facts that refute it. (*Id.* ¶ 44.) There is also no evidence that Bauer had any input into Budinger's decision to lay off Plaintiff. (*Id.* ¶ 46.) There is no evidence that Bauer told Budinger the substance of the March 6, 2009 meeting between Plaintiff and Bauer or that Plaintiff requested to be taken off night call. (*Id.* ¶ 45; Pl. 56.1 Stat. ¶ 31.) Nor did Plaintiff discuss the meeting, his

---

[3] Allied terminated four other employees between February 2009 and June 2009. (Def. Ex. E. (Terminated Empl. Listing).) One of the terminated employees, Jeff Sowka, was Plaintiff's boss, had worked for the company for approximately 10 years, was an operations manager and a friend of Budinger. (Def. 56.1 Stat. ¶¶ 69–70.) Allied alleges that Sowka was laid off in February 2009 because of the downturn in economy and need to reduce overhead; however there is no direct evidence that he was "laid off." (*Id.* ¶ 72; Pl. Resp. to Def. 56.1 Stat ¶ 72.) Further we observe that he was terminated in early February, and Allied alleges that the owners told Budinger to cut expenses in March. (*Cf.* Def. Ex. E. (Terminated Empl. Listing); Def. 56.1 Stat. ¶ 42.)

[4] Plaintiff states that Budinger also said he could be rehired if business picked back up, but Allied disputes this. (Pl. 56.1 Stat. ¶ 13.) Budinger is not aware of any contact from Plaintiff regarding rehiring. (*Id.* ¶ 13.)

medication, or his depression with anyone else at Allied. (Def. Ex. C (Dep. of Auer) at 133–36.)
Budinger never perceived Plaintiff as suffering from depression. (Def. 56.1 Stat. ¶ 56.) Bauer
did not know that Plaintiff was laid off until the Monday or Tuesday after March 21, 2009. (*Id.*
¶ 47.) In sum, at the time Budinger fired Plaintiff, there is no direct evidence that Budinger
knew Plaintiff suffered from depression or was taking medication.

The parties dispute whether Plaintiff was replaced at Allied. Though we do not reach the
issue of whether Plaintiff made out a prima facie case of discrimination, and thus do not have to
make a finding on the issue, we agree that there is a question of fact as to whether he was
replaced.[5]

## III. DISCUSSION

### A. Standard of Review

Summary judgment is proper only when "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine
issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for
the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505,
2510 (1986). This standard places the initial burden on the moving party to identify those
portions of the record that "it believes demonstrate the absence of a genuine issue of material

---

[5] Plaintiff relies on various facts to infer that he was replaced. Specifically, Plaintiff points out "Dan" and Potter started to appear on call schedules for service employees after Plaintiff's termination, and it is normal Allied procedure for a new service employee to work for several months before being required to take on-call work. (Pl. 56.1 Stat. ¶¶ 11, 37–38.) Potter also allegedly told Plaintiff that Allied was hiring Installers and Service Technicians at both offices. (*Id.* ¶ 34.) Allied has hired eight employees since May of 2009. (Def. Ex. D (New Hire Empl. Listing).) One of these employees, Ken Allen, was hired on May 4, 2009 as a Service Technician. (Def. Ex. A. (Dep. of Budinger) at 26; Pl. 56.1 Stat. ¶ 23.)

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2515. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See id.*, 477 U.S. at 255, 106 S. Ct. at 2513.

**B. Disability Discrimination Claim**

The ADA makes it unlawful for covered employers to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In other words, it "'prohibit[s] an employer from discriminating against a qualified individual with a disability because of the disability.'" *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999)). Therefore, "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability." *Serwatka v. Rockwell Automation, Inc*. 591 F.3d 957, 962 (7th Cir. 2010).

To demonstrate that Plaintiff was fired because of his disability, he may rely on either of two distinct evidentiary methods: the direct method or the indirect method. Under the direct

method, Plaintiff may establish intentional discrimination by producing evidence that his disability motivated the decision to terminate him; this evidence may be either direct or circumstantial. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). The indirect method for proving disability discrimination follows the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under this method, Plaintiff has the burden of establishing a prima facie case of discrimination; if the elements are established, discrimination is inferred and the burden of production shifts to the defendant to raise a legitimate, nondiscriminatory reason for the firing. Once a legitimate reason is offered, the inference of discrimination is removed, and Plaintiff must establish that the offered reason is in fact a pretext for intentional discrimination. *See generally Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Plaintiff here argues that he has direct evidence of discrimination consisting of suspicious timing, negative statements made regarding his disability and request to be taken off of night call, and incredible and shifting explanations post termination. More specifically, he asserts that he was fired two weeks after informing Bauer of his disability, that Bauer acted negatively when he learned about the medication and request to be removed from night call, and that the Service Technician levels relied on by Allied were created after this suit was filed to refute that Plaintiff was replaced.

These facts, while significant, are not sufficient to defend a motion for summary judgment because they cannot establish that Plaintiff was terminated *because of* his disability. Plaintiff cannot establish that Budinger knew of Plaintiff's disability when he terminated the employment. The Seventh Circuit has explained that "an employer cannot be liable under the

ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). "At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee 'because of' some other reason." *Id*.

Plaintiff makes various attempts to avoid this problem. First, Plaintiff relies on the "cat's paw" theory to impute Bauer's alleged animus on to Budinger, the ultimate decision maker. Second, Plaintiff contends that Budinger failed to deny knowledge at the time of the termination. Finally, Plaintiff argues that it is unreasonable to believe that Budinger did not know about his disability. None of these arguments are sufficient to meet Plaintiff's burden of producing some defense to a summary judgment motion.

A "cat's paw" case arises when a plaintiff seeks to hold an employer liable for the animus of an employee who did not make the ultimate employment decision. An employer can be held liable when "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action." *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1193 (2011).[6] Allied is incorrect in its assertion that Plaintiff must prove a request to cut expenses "would surely lead to Plaintiff's termination" or that Bauer "exerted such significant influence over the decision that his animus can be imputed to the

---

[6] *Staub* is based on an alleged violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), which prohibits certain employment actions if the employee's membership in a uniformed service is a "motivating factor in the employer's action." 38 U.S.C. § 4311. *Staub*, 131 S. Ct. at 1190. The Seventh Circuit has implicitly applied the holding in *Staub* to ADA cases. *Dickerson*, 657 F.3d at 602.

decision maker." (Reply at 11–12.)  Rather, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub*, 131 S. Ct. at 1194 (emphasis in original).  In *Staub*, the Court held that the plaintiff should be allowed to proceed in a claim against his employer because the plaintiff's supervisors were acting within the scope of their employment when they submitted corrective action reports, the reports were causal factors underlying the decision to terminate the plaintiff, there was evidence that the reports were motivated by hostility towards the plaintiff's military obligations, and there was also direct evidence that the supervisors had the specific intent to cause the plaintiff to be fired.  131 S. Ct. at 1194.

Here, Plaintiff's assertion that Bauer's animus was the proximate cause of his termination is insufficient to reach a jury.  Plaintiff argues that Bauer, aware of Plaintiff's disability after the March 6 conversation, "falsely told Budinger to cut staff due to a false claim of economic duress," and thus created the situation that would cause the termination of Plaintiff.  (Resp. at 13.)  Allied acknowledges that there is a causal relationship between Bauer's instruction to cut cost and Plaintiff's termination—Bauer and his partner told Budinger to cut expenses and overhead and Budinger acted on those instructions.  (Def. Ex. A (Dep. of Budinger) at 9.)  However, to rule in favor of Plaintiff, a jury would have to find Bauer falsely indicated that Allied needed to cut expenses.  For this purpose, we will assume that a question of fact remains as to the nature of the economic downturn affecting Allied.  A jury would also have to believe that Bauer's instruction was motivated by hostility towards Plaintiff's disability and that Bauer had the specific intent to cause Plaintiff to be terminated.  *See Staub*, 131 S. Ct. at 1194.  These

final leaps are too speculative as there is no evidence that a request to cut overheard would likely lead to reducing the number of Service Technicians, let alone terminating Plaintiff, and there is no evidence that Bauer's broad request was based on a very specific alleged animus towards Plaintiff.[7] Therefore, a reasonable jury could not impute Bauer's alleged animus on Budinger.

Plaintiff's second argument is that Budinger never denied knowing that Bauer met with Plaintiff. Plaintiff relies on the fact that when Budinger terminated Plaintiff, Plaintiff asked if the decision had anything to do with his discussion with Bauer, and Budinger did not respond.[8] Budinger's response, even drawing all inferences in favor of Plaintiff, merely indicates that he was aware the Bauer met with Plaintiff, and his knowledge of this is not disputed. Both parties agree that Budinger was in fact the one who told Plaintiff to go to Bauer's office. The response does not support the assertion that Bauer told Budinger about Plaintiff's depression or medication.

Finally, Plaintiff makes general assertions based on the nature of Allied's operations. He insists that there are three reasons why we should not believe Budinger lacked knowledge: (1) Budinger was running the shop and he should have been informed about the discussion between Bauer and Budinger, (2) Bauer and Budinger's father owned the shop, employees freely gossiped, and employees have gossiped about Plaintiff's medical conditions in the past, thus it is

---

[7] Asking an employee to cut costs, without other evidence, cannot be compared to submitting corrective action reports based on fabricated allegations. *See Staub*, 131 S. Ct. at 1193–4 (supervisor's biased reports sufficient factor in termination decision).

[8] As explained above, we discredit Plaintiff's second affidavit that claims Budinger replied "It has nothing to do with that." We instead rely on the deposition testimony that asserts Budinger did not answer and looked away. However, we don't believe the second version of the story would change the outcome.

likely that Budinger would have found out, and (3) Budinger should have been informed that Plaintiff was being removed from night call and was taking prescription medication because these were serious issues. Plaintiff cannot support these assertions. Further, the undisputed facts show that Plaintiff's requested inference is not reasonable. Budinger's deposition clearly states that he did not know Plaintiff suffered from depression, never perceived Plaintiff as being depressed, and was not aware that Plaintiff had requested removal from the night call. (Def. Ex. A (Dep. of Budinger) at 63–65.) Budinger also testified that Bauer did not speak with him regarding the meeting of March 6, 2009, that Bauer did not tell him Plaintiff was taking medication that caused drowsiness, and that Bauer did not tell him that Plaintiff was suffering from depression. (*Id*.) These statements are not refuted, and Plaintiff further admits that he never informed anyone other than Bauer that he suffered from depression. (Def. Ex. C (Dep. of Auer) at 135.) Therefore, Plaintiff's desired inference, that Budinger must have known about Plaintiff's disability, is unsupported speculation and does not meet Plaintiff's burden. *See Hedberg*, 47 F.3d at 931–2.

Without evidence that Budinger was aware Plaintiff suffered from depression, Plaintiff cannot prove that he was discriminated against on the basis of a disability. The same flaw in Plaintiff's case prevents him from relying on the indirect method to show discrimination. Therefore, despite questions of fact remaining—most significantly related to whether Plaintiff was replaced and whether there was a true reduction in force—Allied is entitled to summary judgment.

**IV. CONCLUSION**

For the reasons stated above, we grant Allied's motion for summary judgment. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: January 23, 2011